IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| EDIZONE, LC,<br>          Plaintiff,<br>   v.<br><br>CLOUD NINE, LLC, et al.,<br>          Defendants. | MEMORANDUM DECISION<br>AND ORDER CONSTRUING<br>CLAIMS PURSUANT TO<br>*MARKMAN* HEARING<br><br>Case No. 1:04-CV-117 TS |
| CLOUD NINE, LLC, et al.,<br>          Counter-Claim Plaintiffs, and<br>          Third-Party Plaintiffs,<br>   v.<br><br>EDIZONE, LC,<br>          Counter-Claim Defendant,<br>and<br><br>TERRY PEARCE, et al.,<br>          Third-Party Defendants. | |

This matter comes before the Court for patent claim construction following a *Markman* hearing by the parties.[1]  Plaintiff in this action asserts infringement of the following underlying claims against Defendant:

- claims 24 and 41 of Patent No. 5,994,450 ("the '450 patent"),

- claims 1, 5-6, 26-27, and 30 of Patent No. 5,749,111 ("the '111 patent"), and

---

[1]The parties submitted simultaneous briefs in connection with the hearing.  Plaintiff's brief is found at Docket No. 355.  Defendants' brief is at Docket No. 356.

- claims 1, 7, 9, 20-22, 24-25, 27-28, and 33 of Patent No. 6,026,527 ("the '527 patent).

The parties agree that the Court should construe the following key terms:

- "yieldable" as used in claim 33 of the '527 patent and claim 1 of the '111 patent

- "buckling" as used in claim 1 of the '111 patent and claims 1 and 33 of the '527 patent

- "monomer" as used in claims 24 and 41 of the '450 patent

- "tack modifier" (specifically whether it includes antioxidants when used in an amount less than three percent of the total product weight) as used in claim 41 of the '450 patent.

The Supreme Court, in *Markman v. Westview Instruments, Inc.*, held that claim construction is a matter exclusively within the province of the court.[2]  Claim construction is the first step in an infringement analysis.[3]  "It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history."[4]  "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term.  In such circumstances, it is improper to rely on extrinsic evidence."[5]  However, "[t]he court may, in its discretion, receive extrinsic evidence in order 'to aid the court in coming to a correct conclusion as to the true meaning of the language employed in the patent.'"[6]

---

[2]517 U.S. 370, 372 (1996).

[3]*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

[4]*Id*.  "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language."  *Id*.

[5]*Id*. at 1583.

[6]*Markman v. Westview*, 52 F.3d 967, 980 (Fed. Cir. 1995) (quoting *Seymour v. Osborne*, 78 U.S. 516, 546 (1871)).

The starting point is the claim wording itself.[7]  As a general rule, claim terms are given their ordinary and accustomed meaning as understood by one of ordinary skill in the art.[8]  "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.  In such circumstances, general purpose dictionaries may be helpful,"[9] but the court should "start[] the decisionmaking process by reviewing the same resources as [would a person in that field of technology], *viz*, the patent specification and the prosecution history."[10]

As an exception to the general rule, a patentee may choose "to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history."[11]  "Thus . . . it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning."[12]  Moreover, "the specification is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best

---

[7]*Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1372 (Fed. Cir. 2001).

[8]*Id*.

[9]*Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).  Importantly, such dictionaries constitute extrinsic evidence.  *Markman*, 52 F.3d at 980 ("Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.").

[10]*Phillips*, 415 F.3d at 1313.

[11]*Vitronics*, 90 F.3d at 1582.

[12]*Id*.

3

guide to the meaning of a disputed term."[13]  "[Finally], the court may also consider the prosecution history of the patent, if in evidence."[14]  Within this framework, then, the Court construes the terms in dispute.

      I.    *"Yieldable"*

As a preliminary matter, Plaintiff argues that construction of the term is only necessary as it relates to claim 1 of the '111 patent because, the term appears only in the preamble, but not the body of claim 33 of the '527 patent.[15]  Moreover, Plaintiff states that "yieldable," as used in the '527 patent refers to an intended benefit of the invention, but not an explicit patent claim.[16] Defendants counter that Plaintiff is barred from so arguing because, under a current re-examination of the '527 patent before the United States Patent and Trademark Office ("USPTO"), Plaintiff is claiming that the term "yieldable" does constitute a claim within the patent.[17]

"[C]lear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part the claimed invention."[18]  Similarly, Plaintiff's reliance on

---

[13]*Id.*

[14]*Id.*  "The prosecution history . . . consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent."  *Phillips*, 415 F.3d at 1317.  "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes."  *Id.*

[15]Docket No. 355, at 21-22.

[16]*Id.*

[17]Docket No. 356, at 8 n.9, Ex. I.

[18]*Catalina Mktg. Int'l Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).

the preamble as a source to distinguish patents during its reexamination should also result in the preamble being construed as a claim limitation in this case.  Defendants correctly point out that "claims may not be construed in one way in order to obtain their allowance and a different way against accused infringers."[19]  The Court will therefore construe the term "yieldable" as used in both claim 1 of the '111 patent, and in the preamble of claim 33 of the '527 patent.

Plaintiff argues that the term "yieldable" as used in its patents means "able to give way under force or pressure."[20]  Plaintiff emphasizes that the term should reflect the shape memory properties of the patented material.[21]  Plaintiff points to the specifications in the '111 and '527 patents which state that "the cushioning element is yieldable as a result of compressibility" and that it "yields under the weight of the cushioned object."[22]  On the other hand, Defendants argue that the term means "having a yield point."[23]  Defendants support this interpretation by pointing to extrinsic evidence, namely, the Random House Webster's Unabridged Dictionary, and a technical manual, the Standard Terminology Relating to Rubber.[24]

The Court finds that, based upon the specifications, the term "yieldable" as used in Plaintiff's patents is more aptly construed as "able to give way under force or pressure."  The Court is unconvinced that the extrinsic evidence proffered by Defendants provides the correct ordinary and accustomed meaning as understood by one of ordinary skill in the art.  Rather,

---

[19]*Spectrum Intern., Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1379 (Fed. Cir. 1998).

[20]Docket No. 355, at 23-28.

[21]*Id.* at 20.

[22]*Id.* at 23-24.

[23]Docket No. 356, at 8.

[24]*Id.* at 9.

given the use of the term in the specifications, and the intended nature of the invention, namely, to maintain shape memory, Plaintiff's definition properly encompasses the scope of the correct meaning. Defendants' proposed definition, on the other hand, incorporates one aspect of being yieldable, namely, able to pass a yield point, but fails to address the broader meaning inferred by a reading of the specifications.

     II.     *"Buckling"*

Plaintiff next argues that the proper construction of "buckling" is "the planned failure or collapse of a column wall resulting in redistribution or lessening of the load carried by the column."[25] Plaintiff points to the language of the '111 and '527 patents which states that "[b]uckled columns offer little resistance to deformation, thus removing pressure from the hip bone area."[26] Defendants rely on a Mechanics of Materials manual and the Random House dictionary to define "buckling" as "lateral bending of a portion of a column, or the change in primary loading of a portion of a column from axial compression to lateral bending."[27] Defendants also point to a Final Office Action by the USPTO in a Reexamination of Patent '111, in which the USPTO rejected Plaintiff's proposed definition of the term and noted that "the term buckling . . . is defined as bending."[28]

Again, the Court finds that Plaintiff's intrinsic evidence, rather than Defendants extrinsic evidence, provides the proper ordinary and accustomed meaning as understood by one of

---

[25]Docket No. 355, at 28.

[26]*Id.*

[27]Defs.' *Markman* Ex. M, at M-12.

[28]*Id.*

ordinary skill in the art.  Specifically, the Court notes that bending, as defined by Defendants,

does not necessarily result in a lessening of a load as a person of ordinary skill in the art would

understand Plaintiff's use of the term "buckling" upon a careful reading of Plaintiff's patents.

As to Defendants' intrinsic evidence, the Court notes that the USPTO's reexamination

definition appears to be vague and overbroad.  Defendants argued at the *Markman* hearing that

one understood definition of buckling defines the term as *lateral* bending *of a portion of a*

*column*.  However, the USPTO states only that the term means "bending."  This lack of clarity in

the examination history, combined with the specification language describing buckled columns,

leads the Court to accept Plaintiff's preferred definition.

III.     *"Monomer"*

Plaintiff argues that the term "monomer" should be construed to mean small repeating

units found within an already formed polymer.[29]  At the hearing, Plaintiff clarified that it is

arguing that it has acted as its own lexicographer in this instance, giving the term a meaning with

which it is not normally associated.  To support this argument, Plaintiff points to various sources

of intrinsic evidence.  First, a claim limitation in claim 24 of patent '450 states that "B is a . . .

polymer including . . . monomers" and "weights of . . . monomers comprise about 50 weight

percent of . . . polymer B."[30]  Second, a claim limitation in claim 41 of '450 states that "B is a . . .

polymer comprising a plurality of monomers."[31]  Third, the definition of "polymerization" in the

---

[29]Docket No. 355, at 11.

[30]*Id.*

[31]*Id.* at 11-12.

'450 patent states that it is a process whereby monomers are connected to form a polymer.[32]
Fourth, the specification in the '450 patent, which contains Figures 6a through 6d, illustrates
what are called by Plaintiff monomers, only in reacted form, as they exist within a polymer.[33]
Fifth, a narrative statement in the '450 patent states, with respect to a polymer used in all of
Plaintiff's products, that the "polymer . . . is made up of . . . monomers."[34]

      Defendants argue that the proper construction of the term "monomers" is "small
molecules capable of reacting with like or unlike molecules to form a polymer."[35]  Defendants
point to two sources of intrinsic evidence to support their proposed construction.  First, like
Plaintiff, Defendants point to the '450 patent specification which states that "monomers are
connected in a chain-like fashion to form a polymer."[36]  Second, during the prosecution history
of the '450 patent, the USPTO patent examiner stated that Plaintiff-defined monomers were not
actually monomers in the sense that that term should be used.[37]  Defendants also point to one
source of extrinsic evidence, the Standard Terminology Relating to Rubber, to support their
claimed construction.[38]

      The Court believes that Plaintiff's intrinsic evidence, as well as Defendants' evidence
from the prosecution history, support that Plaintiff acted as its own lexicographer with respect to

---

[32]*Id.* at 12.

[33]*Id.* at 13-14.

[34]*Id.* at 15.

[35]Docket No. 356, at 10.

[36]*Id.*

[37]*Id.* at 10-11.

[38]*Id.* at 10.

this term.  Collectively, the abovementioned limitations and specifications clearly state that

Plaintiff referred to monomers as they existed within an already formed polymer, and not as

unreacted molecules.  This conclusion is supported by the fact that the USPTO, during the

prosecution of the patent by Plaintiff, noted that the Plaintiff was using a rather unorthodox

definition of the term.  Additionally, the Court views Plaintiff's construction as correct because

an adoption of Defendants' proposed definition, as it relates to this patent, would obviate

Plaintiff's invention.[39]

IV.     *"Tack Modifier"*

Plaintiff argues that the term "tack modifier," as used in its patents, should be construed

so as to include antioxidants when used in an amount greater than .03 percent of the total weight

of the final product.[40]  To support this construction, Plaintiff uses several steps, based on intrinsic

evidence.  First, Plaintiff asserts that the antioxidants used in its product have two functions:  a

primary function of preventing degradation, and secondary function of modifying tack.[41]  Next,

Plaintiff points to language in the '450 patent stating that "the use of excess antioxidants reduces

or eliminates tack."[42]  Plaintiff then notes that the '450 patent specification has fourteen

examples of mixtures to make their product, three of which have "very minor amounts" of

---

[39]*See Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996), *overruled on other grounds by Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 234 F.3d 558 (Fed. Cir. 2000) ("Indeed, a claim interpretation that would exclude the inventor's device is rarely the correct interpretation.").

[40]Docket No. 355, at 31.

[41]*Id.* at 30.

[42]*Id.* at 31.

antioxidants.[43]  These minor amounts are roughly .03 percent of the total weight of the final

product.[44]  Plaintiff argues that these minor amounts must serve at least to prevent degradation,

and therefore, that the amounts in "excess" as previously referred to, must be amounts over .03

percent.[45]

Defendants argue that the term "tack modifier," as used in Plaintiff's patents, should

include antioxidants only when used in an amount greater than three percent of the total weight

of the product.[46]  Defendants note that the '450 patent states, immediately preceding the language

relating to excess antioxidants, that

> the materials of the present invention include up to about three weight percent
> antioxidant . . . .  When a combination of antioxidants is used, each may comprise
> up to about three weight percent. . . . In the presently most preferred embodiment
> of the present invention, the materials include 2.5 weight percent primary
> antioxidant and 2.5 weight percent secondary antioxidant. . . . Additional
> antioxidants may be added for severe processing conditions involving excessive
> heat or long duration at a high temperature.[47]

Accordingly, Defendants argue that the patent teaches that up to about three weight percent of

any one antioxidant is normal usage, and any more than this must be what the patent refers to as

"excess."

Looking to the claim language itself, as well as the context in which that language is

used, this Court finds that the proper construction of the term "tack modifier" should include an

antioxidant only when that antioxidant is used in an amount greater than three percent of the total

---

[43]*Id.*

[44]*Id*.

[45]*Id.*

[46]Docket No. 356, at 11.

[47]*Id.* at 11-12.

weight of the product.  The '450 patent addresses a seeming upper threshold of antioxidant amounts when it states that "each [antioxidant] may comprise up to about three weight percent."[48]  Because the subsequent paragraph begins "the Applicant has unexpectedly found that the use of excess antioxidants reduces or eliminates tack,"[49] it follows that "excess" means amounts beyond those referred to in the upper threshold established in the preceding paragraph.

In comparison, Plaintiff's proposed construction is more attenuated, and illogical, as it essentially asks the Court to construe the terms in its patent to mean that any amount of antioxidants beyond "very minor amounts" must be "excess."  Plaintiff seems to argue that because an amount of antioxidants equal to .03 percent of total product weight must serve the so-called primary antioxidant purpose of preventing degradation, this must somehow also be the bottom threshold at which the antioxidants begin to serve the alleged tack modifying function. However, the Court notes that there is no evidence within the patent terms that links prevention of degradation and tack modification in this manner.  Therefore, acceptance of Plaintiff's proposed construction would require a substantial logical leap.  Moreover, while Plaintiff argues that antioxidants are used in all of its products, nowhere does Plaintiff argue that its invention necessarily includes the excess antioxidant amounts necessary to serve a tack modifying function.  To the contrary, the argument in Plaintiff's brief implies that at least some of its formulations exclude the amounts of antioxidants which would be necessary to modify tack. Accordingly, the Court will accept Defendants' proposed construction over Plaintiff's.

---

[48] '450 Patent, at col. 26, ln. 43.

[49] *Id.* at lns. 53-55.

For the purposes of this litigation, it is therefore

ORDERED that the term "yieldable" as used in claim 33 of the '527 patent and claim 1 of the '111 patent is construed to mean "able to give way under force or pressure."  It is further

ORDERED that the term "buckling" as used in claim 1 of the '111 patent and claims 1 and 33 of the '527 patent is construed to mean "the planned failure or collapse of a column wall resulting in redistribution or lessening of the load carried by the column."  It is further

ORDERED that the term "monomer" as used in claims 24 and 41 of the '450 patent is construed to mean "small repeating units found within an already formed polymer."  Finally, it is

ORDERED that the meaning of the term "tack modifier" as used in claim 41 of the '450 patent shall include antioxidants only when each is used in an amount greater than three percent of the total weight of the product.

DATED September 21, 2006.

BY THE COURT:


_____
TED STEWART
United States District Court Judge